# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

COREY SHERROD SAMPSON,     *

Plaintiff     *

v     *        Civil Action No. ELH-19-1333

RUTH PINKNEY, P.A.,     *
STEPHANIE CYRAN, N.P.,
JENNIFER PATTERSON, R.N.,     *
DIANNA BAKER, L.P.N.
    *
Defendants
    *
    ***

## MEMORANDUM OPINION

This civil rights action concerns a prisoner who is dissatisfied with the quality of his medical care. His frustration is understandable. But, the question is whether the quality of his care amounts to a constitutional violation.

Corey Sherrod Sampson, the self-represented plaintiff, filed suit on May 6, 2019, pursuant to 42 U.S.C. § 1983, alleging that defendants Ruth Pinkney, P.A.; Stephanie Cyran, N.P.; Jennifer Patterson, R.N.; and Dianna Baker, L.P.N., employees of "Wexford Health Medical Sources, Inc.", acted with deliberate indifference by failing to provide him with adequate care for an inguinal hernia during the time he was incarcerated at Eastern Correctional Institution ("ECI") in Maryland. ECF 1. In particular, plaintiff complains that he first complained of groin pain in January 2017, but it took almost a year for medical staff to diagnose his condition, and then it took until May 2019 for his surgical repair.

Defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 15. The motion is supported by a memorandum (ECF 15-3) (collectively, the "Motion") and exhibits, including Sampson's medical records. ECF 15-4; ECF 15-5. Sampson opposes the Motion. ECF

19.  His opposition includes a 19-page handwritten submission (ECF 19) and over 50 pages of exhibits.  ECF 19-1.  However, Sampson did not file any declarations or affidavits.  *Id.*  Defendants have replied.  ECF 20.

No hearing is necessary to resolve the Motion.  Local Rule 105.6.  For the reasons that follow, I shall construe the Motion as one for summary judgment and I shall grant it.

## I.  Factual Background

Plaintiff alleges that he first complained of right groin and abdominal pain on January 4, 2017.  He complains that medical staff failed to diagnose his inguinal hernia[1] for almost one year, and then failed to provide hernia repair surgery until May 2, 2019.  Additionally, he claims that his medical records have been falsified.  Sampson seeks monetary damages and want assurance that his "surgical procedure is done effectively."  ECF 1 at 17.

The evidence indicates that, at the relevant time, Sampson was in his late 20's or early 30's. *See*, *e.g.*, ECF 15-4 at 7, 58; ECF 15-5, ¶ 4.  Sampson is generally seen in the Chronic Care Clinic at ECI for esophageal reflux.  ECF 15-4 at 2; ECF 15-5 (Affidavit of Jason Clem, M.D.), at ¶ 4. Sampson went to the Chronic Care Clinic on January 4, 2017, where he was seen by Ruth Pinkney, P.A.  Sampson claims he reported to Pinkney that, while exercising, he felt "something tear/pop in his lower right abdomen/right groin region."  ECF 1 at 3, ¶ 1a.  He also experienced a sudden irregularity of bowel movements and expressed concern that he might have a hernia.  *Id.*

---

[1] An inguinal hernia is a bulging of the contents of the abdomen through a weak area in the lower abdominal wall. Inguinal hernias can occur at either of two passages through the lower abdominal wall, one on each side of the groin. These passages are called inguinal canals. Inguinal hernias can also occur through two deeper passages in the groin called the femoral canals. Hernias through these passages are also known as femoral hernias. Inguinal hernias may slide in and out of the abdominal wall. A doctor can often move an inguinal hernia back inside the abdominal wall with gentle massage. *See* https://search.nih.gov (viewed February 25, 2020).

Sampson's medical record from the visit indicates that he complained of having pain in his right testes for a week, but denied any injury. ECF 15-4 at 2. Examination revealed a tender right epididymis, without palpable abnormal groin lymph nodes, testicular masses, or evidence of an inguinal hernia. *Id.* Pinkney's diagnosis was acute orchitis (inflammation of the testes) and epididymitis (inflammation of the tube at the back of the testes that stores and carries sperm). *Id.* Pinkney prescribed Ibuprofen 400 mg for pain and an antibiotic, Cipro 500 mg, 1 tablet twice daily. She also advised Sampson to avoid excessive weight lifting. *Id.*; *see also* ECF 15-3 at 2, n. 1-3.

Sampson states that Pinkney also gave him several psyllium fiber packets to address his irregular bowel movements. ECF 1 at 3. He acknowledges Pinkney performed a physical exam, but he claims Pinkney falsely documented that he denied injury or swelling. ECF 19 at 3.

On January 24, 2017, Sampson submitted a sick call request, complaining of continuing pain in his groin and intestinal area and irregular bowel movements. ECF 15-4 at 4. Ellen Moyer, R.N. saw Sampson on January 28, 2017. *Id.* at 6. He reported that he had run out of medication for the epididymitis, his pain was continuing, and he was having bowel movements only once per day instead of the usual three times per day before his problem started. *Id.* Moyer referred him to a medical provider, noting that Sampson's condition had not responded to treatment protocol. *Id.*

Cyran saw Sampson on February 17, 2017, for complaints of pain in his right lower abdomen and right testicle. ECF 15-4 at 7. Sampson reported that he felt pain when working out, continued to exercise, and thought there might be a connection to his issue. *Id.* But, he claimed that he "ha[d] not worked out in some time." *Id.* Sampson expressed concern about a possible hernia, appendicitis, or testicular cancer. *Id.*

Physical examination revealed no signs of a hernia, masses, or lumps in the testicles or groin. However, Sampson's right scrotum was tender. *Id.* at 8. Sampson reported straining during bowel movements, which he said caused hemorrhoids and occasional abdominal pain. *Id.* Therefore, Cyran prescribed laxatives and stool softeners for him. *Id.* at 7, 9.

Sampson was not in acute pain. *Id.* at 7, 8. However, because Sampson had completed a course of antibiotics without improvement, Cyran ordered laboratory tests, a urinalysis, and an x-ray of the abdomen. *Id.* at 7, 9.

X-ray's were taken on February 22, 2017. *Id.* at 10. They showed no evidence of bowel dilation, intra-abdominal pathology, or acute cardiopulmonary disease. *Id.*

On April 25, 2017, Sheila Kerpelman, N.P. saw Sampson at the Chronic Care Clinic for his concerns, including abdominal pain and constipation. *Id.* at 11. The medical chart from the visit notes that Sampson had been treated on January 4, 2017, for epididymitis "with resolution of the testicular pain." *Id.* It also indicates that Sampson reported to Kerpelman that he had stopped all exercise as recommended and was constipated. *Id.* Further, it notes that he was seen again February 17, 2017, for right lower quadrant pain. *Id.*

Physical examination showed tenderness over the left external oblique abdominal muscle with increased pain during a straight leg raise. Kerpelman noted no inguinal hernia or testicular mass. She assessed Sampson as having a strain of the left internal/external oblique, prescribed ibuprofen 400 mg. as needed for four months, advised he could return to light exercise, stopped the constipation medications previously prescribed, and recommended using diet and drinking plenty of water to restore his bowel habits. *Id.* at 11-12.

Sampson submitted a sick call slip on September 10, 2017, complaining of irregular bowel movements and expressing his belief that he had a "small hernia." *Id.* at 13. Melissa Richbark,

R.N. saw Sampson on September 14, 2017, for right groin pain. *Id.* at 14. She noted that his previous hernia check was negative. *Id.* Sampson denied vomiting or diarrhea and stated he had not been working out since his last visit. She encouraged Sampson to exercise but to avoid heavy lifting and referred him to a provider for re-evaluation. *Id.*

On October 19, 2017, Sampson was listed as a "no show" for his provider follow-up. It was reported that he was going to a sporting event. *Id.* at 19. The record, which was generated by Dianna Baker, LPN, also indicates that Sampson "will not be rescheduled," and "is aware that he will need to start the sick call process over again." *Id.*

Sampson insists that he was unaware that he had a medical appointment, did not decline the appointment in order to go to the sporting event, and did not sign a refusal form. ECF 1 at 12-14. Sampson filed an Administrative Remedy Procedure ("ARP") complaint on July 20, 2018, claiming that the document showing him as a "no show" on the day of the sports event was falsified. ECF 19-1 at 25. The ARP was dismissed as untimely. *Id.*

Dr. Clem, a licensed physician, was employed by Wexford from July 2011 to December 2018. ECF 15-5, ¶ 1. He provided medical services at ECI. *Id.* He explains that the "administrative system requires that reports of a no show be filed to document why no medical care was provided to an inmate [who] was scheduled to be seen by medical." ECF 15-5, ¶ 17. He asserts, *id.*: "Blame is not the issue, the point is to document a non-fulfilled appointment." However, the record does not indicate how inmates are made aware of their appointments or how the information about the sporting event was reported to the medical scheduler.

On October 30, 2017, Sampson filed an ARP, ECI-2799-17, alleging that "since Jan/Feb of 2017," he had been complaining to medical staff about a "tearing in my lower abdominal/groin area, and there was pain in my testicles as well." ECF 19-1 at 1. Sampson added that "although

there wasn't any visible evidence at the time, [he] believed it to be a hernia that hadn't fully passed through [his] abdominal wall." *Id.* Sampson said his injury was accompanied by a dramatic decrease in the regularity of his bowel movements and the stool softeners and laxatives he was prescribed made him bleed and feel bloated. He also stated that he had stopped working out since January 2017 in the hope that the hernia would heal. *Id*. at 2.

To investigate the ARP, Jennifer Patterson, the head nurse, interviewed Sampson about his concerns on or about November 1, 2017. ECF 1 at 10. Sampson alleges that Patterson acted in a "mean-spirited" and "condescending" manner, asking him if he knew what a hernia was. She told him that even if he had a hernia, the standard treatment was to use a hernia belt. *Id*. at 12. When he asked why he had to wait since September 14, 2017, to meet with a primary provider, Patterson informed him that he had been called to medical on October 19, 2017, but had "opted out" because of a sports event. Sampson told Patterson that he did not know he had an appointment that day and had not refused his medical appointment. *Id*. Sampson alleges that Patterson's "negative, mean-spirited, and combative conduct, as [he] sought treatment" was "unnecessary and counter-productive, causing him mental anguish" and "hernia complications." ECF 1 at 13-14.

The ARP was ultimately found to have no merit. ECF 19-1 at 5. The ARP response states, ECF 19-1 at 5:

> After investigation into your complaint, your ARP has been found to have no merit. According to you, in the ARP interview with this writer, you felt as though you may have a hernia and wants [sic] surgery before it gets worse. You also stated that you felt a pulling injury months ago and still has [sic] intermitted pain. You were seen by the provider on 1/4/2017 for pain in testes at which time you [were] treated for acute epididymitis and saw the nurse on 1/2812017. On 2/17/2017 you were seen in sick call by the provider where you expressed the concern about testicular cancer and appendicitis but the exam was negative for either and also noted negative for hernia. X ray of abdomen was ordered and resulted as normal. 4/25/2017, you were seen in chronic care at which time the abdominal exam noted movement of gas in the area of complaint but normal abdominal and testicular exam. Again, you were seen for those issues by the nurse on 9/14/2017 and

9/24/2017 no abnormalities noted at those visits. You were scheduled for evaluation again by provider on 10/19/2017 but it was documented that you opted to go to a· sporting event instead of visit. There have been no abnormal exams subsequent to the initial epididymitis and no hernia found. You continue to be followed in chronic care as well as through the sick call process.

Defendants maintain that the purpose of Patterson's meeting was to investigate the ARP complaint, not to provide medical treatment or examine Sampson. ECF 15-5 at 6, ¶ 19. To the extent Sampson objects to Patterson's alleged statement about the hernia belt, Patterson, as a registered nurse, cannot prescribe a treatment plan. *Id.*

On November 28, 2017, Sampson was seen by Paul Matera, M.D. for concerns that he had a hernia. Matera found no evidence of a hernia, but noted that Sampson's description of symptoms could be indicative of a right intermittent hernia. Dr. Matera was unable to induce the hernia while Sampson was standing or on his back. ECF 15-4 at 21. Sampson was instructed that if he had pain, fever, nausea, vomiting, or bleeding to report immediately for evaluation, as this could be an indication of an incarcerated hernia,[2] requiring immediate surgery. ECF 15-5 at 4, ¶ 11; *see also* ECF 15-4 at 22.

Sampson was seen by Pinkney on January 17, 2018. ECF 15-4 at 24-26. She noted that he had a "right inguinal hernia." *Id.* at 24. The medical record from the visit indicates that Sampson reported occasional pain, "the hernia was out more," and he "avoids exercise because he does not want it to worsen." ECF 15-4 at 24. Further, the report indicates that the hernia was

---

[2] An incarcerated hernia is one that cannot be pushed back into place because it is trapped in the abdominal wall. An incarcerated hernia can become strangulated, which cuts off the blood flow to the tissue that is trapped. A strangulated hernia can be life-threatening if it is not treated. *See* www.mayoclinic.org (reviewed February 25, 2020).

present in the inguinal area, *id.* at 25, a hernia belt would be ordered, *id.* at 26, and that the hernia is "reducible." *Id.* at 25.[3]

Pinkney ordered a hernia belt and prescribed Hydrocil, a laxative. ECF 15-4 at 24-26. In his Affidavit, Dr. Clem posits: "It cannot be determined if this hernia was related to plaintiff's January 2017 groin pain or was newly developed." ECF 15-5 at 4, ¶ 12.

Sampson alleges that by January 17, 2018, when he was seen by Pinkney, his hernia was apparent, and had "pierced through his abdominal wall," after first having been observed in September of 2017. ECF 1 at 3. According to plaintiff, Pinkney examined Sampson and "confirmed the protrusion" in his "lower right groin" as "an inguinal hernia." *Id.* at 4. Yet, he claims that for an "entire year," his condition was "left untreated," and he was straining to defecate. *Id.* Sampson inquired about surgical treatment, to which Pinkney allegedly replied, "'they don't like doing surgery'" and he was measured for a hernia belt. *Id.* Pinkney also prescribed Colace and psyllium fiber to ease and regulate his bowel movements. *Id.*

According to Sampson, he did not receive the hernia belt until July 6, 2018. ECF 1 at 4. Moreover, he claims that the belt failed to cover the area of the hernia, and it "amounted to no treatment at all." *Id.*

On April 4, 2018, Tolulope Lawson-John., N.P. examined Sampson in the Chronic Care Clinic. ECF 15-4 at 27. Sampson voiced concerns about his worsening inguinal hernia and "worsening constipation." *Id.* He said the hernia was "reducible but "comes out right back." *Id.* Sampson also reported that he had still not received the hernia belt that was supposedly ordered at his last medical appointment. *Id.* He denied vomiting or abdominal pain, but said that the "hernia

---

[3] A hernia is reducible when the hernia bulge can be returned back to the anatomical position with physical manipulation. ECF 15-5 at 4, ¶ 12.

is painful." *Id.* Lawson-John reordered the hernia belt and placed a request for a gastrointestinal ("GI") consultation. *Id.* at 27-30.

Sampson was seen by Racine Laird, LPN, at sick call on June 4, 2018. *Id.* at 31. Sampson requested lab work and inquired about the GI consultation and the hernia belt. Laird also emailed providers to check on Sampson's concerns. *Id.* at 31.

On June 14, 2018, JoVonne Osborne, C.R.N.P. saw Sampson for his annual physical examination. Sampson reported he had a right inguinal hernia for more than a year and complained of constipation. Examination confirmed Sampson had a right inguinal hernia when he coughed. Osbourne determined the hernia was reducible. She noted a GI consultation was requested on April 4, 2018, for the hernia. ECF 15-4 at 34-35.

Cyran saw Sampson on July 23, 2018. ECF 15-4 at 36. He reported the hernia had worsened, his pain was increasing, and the hernia belt did not work due to the location of the hernia. *Id.* Cyran noted Sampson's constipation was stable.

Physical examination revealed a small right inguinal hernia that was not reducible and was painful with palpation. *Id.* at 36, 37. Cyran reviewed with Sampson the symptoms that would require him to report promptly to medical providers. *Id.* at 36.

Sampson alleges that when he asked about the consultation request placed on April 4, 2018, Cyran said she would resubmit the request. ECF 1 at 7. The medical report notes "consult placed on 4/4/18, provider f/u with coordinator r/t status of consult." ECF 15-4 at 36. It later reads: "Discussed mgmt/trmt options with coordinator r/t status of consult." *Id.* at 38. Sampson's prescriptions for Colace and Hydrocil were also renewed. *Id.*

Sampson saw Kimberly Malin, R.N. on July 29, 2018, for a blood pressure check. *Id.* at 40. Sampson accused her of falsifying documentation about him. *Id.* He claimed that on May 1,

2018, when he was not called for sick call, Malin had nevertheless recorded him as a "no show." *Id*. He insisted that he had not refused the appointment; rather, he had not been called. *Id.* He told Malin: "Well you all did it other times too- October last year." He advised that it was recorded he did not attend a medical appointment because he was involved in sports, but he argued he was never called. *Id.* According to Sampson, because he "bad mouthed" Malin, she asked correctional officers to terminate the medical visit. *Id.*; *see also* ECF 1 at 15-16.

Dr. Matera met with Sampson, on July 31, 2018, and Sampson reported a daily bowel movement, sometimes with blood. ECF 15-4 at 41. Sampson was not wearing his hernia belt because he claimed it did not help him. *Id.* Examination revealed the hernia was reducible only with straining. Dr. Matera prescribed Dulcolax. *Id.*

On July 31, 2018, Dr. Clem discussed the GI consultation with Dr. Smith[4] and the Wexford Utilization Management team. The medical report notes the physician assessment indicated Sampson had no emergency symptoms and the hernia was reducible with straining. The treatment plan was to continue onsite management because the hernia was assessed as still reducible and not incarcerated. ECF 15-4 at 44; ECF 15-5 at 4, ¶ 13.

On August 10, 2018, Cyran put an administrative note on Sampson's chart, reviewed his hernia treatment plan, and discussed onsite management with the director of nursing. ECF 15-4 at 45-47.

On August 23, 2018, Sampson asked about the status of his GI consult in a sick call slip. *Id.* at 48.

Dr. Matera saw Sampson in the Chronic Care Clinic on October 18, 2018. ECF 15-4 at 49, 50. He diagnosed Sampson with a right femoral sliding hernia. *Id.* Sampson had no abdominal

---

[4] Dr. Smith is not identified in the record.

pain, and when supine, the hernia resolved. But, the hernia occasionally presented when Sampson was standing, *id.* at 49, 50, but reduced with "gentle pressure." *Id.* at 49. Sampson again reported that the hernia belt was not helping. *Id.* He was told to return to the clinic immediately if he had an onset of certain symptoms. *Id.* at 49.

Cyran met with Sampson on January 18, 2019. ECF 15-4 at 52. The notes reflect that Sampson expressed his view that he has had an inguinal hernia for approximately two years, and that his "medical needs are not being met in a timely manner." *Id.*

On examination, Sampson had a 4 cm hernia when standing which reduced with gentle pressure but immediately popped back out. ECF 15-4 at 52, 54, 56, 57. After contacting the medical director, Cyran resubmitted a surgical consultation for Sampson, due to his complaints of pain and worsening symptoms. *Id.* at 56-57.

Sampson claims that he also complained that his symptoms had worsened, he was in pain, and was constipated. ECF 1 at 8. And, he expressed concern at that visit that his hernia would prevent his participation in a substance abuse program. *Id.* at 7; *see also* ECF 19-1 at 18. Further, Sampson asserts that he asked again about the surgery consultation, and contends Cyran became "offensive, retorted that she never insisted on resubmitting consult," and said that the consultation was already submitted. ECF 1 at 7.

Sampson indicated he had not been able to exercise since 2017, when he was advised to avoid heavy lifting. *Id.* at 8. According to Sampson, however, Cyran believed that Sampson had continued to do so, as reflected in his medical records of February 17, 2017. Sampson questioned whether the records had been falsified or were otherwise inaccurate. *Id*. at 7, 8. In response to this suggestion, Cyran allegedly said "if it's documented, it will hold up in court." *Id*. at 8.

On March 7, 2019, Sampson was evaluated by Ashok K. Agrawal, M.D. at Bon Secours Hospital in Baltimore. *Id.* at 58. He was 31 years old at the time. *Id.* Dr. Agrawal wrote: "Needs repair as soon as possible." *Id.*

Dr. Clem avers that, "[c]ontrary to Plaintiff's allegation that this assessment called for immediate surgery, this recommendation indicated that Plaintiff would benefit by surgery which should be scheduled as soon as possible in the normal course." ECF 15-5 at 5, ¶ 16. He explains that immediate surgery would be indicated only for an incarcerated hernia, which Sampson did not have, and it typically takes 6-8 weeks to schedule an off-site medical visit in nonemergency circumstances. *Id.*

Sampson indicates that on March 29, 2019, he had preoperative blood work and an EKG, in anticipation of the surgery. And, on April 17, 2019, he had an x-ray. ECF 1 at 9, 10.

On April 11, 2019, Sampson submitted a sick call slip for a missed visit to the Chronic Care Clinic the week before. ECF 15-4 at 62. He needed his medications renewed.

Sampson states that he met with Dr. Matera on April 18, 2019, in the Chronic Care Clinic.[5] ECF 1 at 9. Dr. Matera assured him that he would be receiving surgery in two weeks. Sampson states the surgery was delayed, however, "due to the faulty record system," and on April 26, 2019, Sampson was scheduled for an x-ray and an EKG, even though he had already received a preoperative x-ray and EKG. Sampson asserts: "It's almost as if once the surgery was approved and [he] requested his medical records (twice and was never responded to) assuming that a lawsuit may have been pursued, it's very likely that once more, the medical records may have been altered." *Id.* at 10.

---

[5] The record of that visit is not included in the exhibits.

Sampson underwent right inguinal hernia repair surgery on May 2, 2019, at Bon Secours. *Id*. at 63. According to Dr. Clem, Sampson was clinically stable during the period he was initially diagnosed with the hernia until the surgery was performed. ECF 15-5 at 5, ¶ 16. He continues to have access to more immediate medical care through the use of the sick call process. *Id*. at 7, ¶ 21.

Plaintiff maintains that Pinkney and the others acted with deliberate indifference to his serious medical need by misdiagnosing his condition, administering "careless examinations" that delayed his treatment, and failed to provide adequate treatment by insisting that he try a "cheaper form of treatment" (hernia belt) while his pain and constipation continued and worsened. ECF 1 at 5. In addition, Sampson claims that when he told Cyran he was receiving negligent medical care, she became upset and claimed that Sampson kept exercising, as reflected in his medical record of February 17, 2017. *Id*. at 7. According to Sampson, this information was inaccurate and false, because he had stopped working out to avoid worsening his pain. *Id*.

In his opposition to the Motion, Sampson alleges that, following his hernia surgery, he continues to need fiber packets and Colace for constipation. But, he does not specifically allege that defendants are responsible for his post-surgical condition. ECF 19 at 6-7.

## II.    Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland,* 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 261 (4th Cir. 1998).[6]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural

---

[6] In contrast, a court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp*., 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC,* 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.,* 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv*. Co., 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), reversed on other grounds, *Gardner v. Ally Financial Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery

would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair,* 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Sampson has not filed an affidavit under Rule 56(d). He asks in his opposition for this court to order the director of medical records at ECI to disclose his medical records from May 29, 2014 to December 2016, to show he did not have constipation before January of 2017. ECF 19-2. Even if Sampson had filed an affidavit or declaration under Rule 56(d), it is unclear how these records would be material to demonstrating an Eighth Amendment claim in connection with treatment of Sampson's hernia. Moreover, in light of the many relevant exhibits submitted by both sides, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d

199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313

(4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" Bouchat, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.,* 477 U.S. at 323–24).

### III. Discussion

#### A. Section 1983

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir. 2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). In other words, there is no respondeat superior liability under §

1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

**B. The Eighth Amendment**

Sampson's claims regarding his medical care are governed by the Eighth Amendment to the United States Constitution, which prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). The Eighth Amendment "proscribes more than physically barbarous punishments." *Estelle,* 429 U.S. at 103.

It also "embodies" the " 'concepts of dignity, civilized standards, humanity, and decency....' " *Id.* at 102 (citation omitted).

Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). And, the Eighth Amendment imposes "certain basic duties on prison officials," such as requiring "reasonable measures to guarantee the safety of the inmates." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). Therefore, "[s]crutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Notably, "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard an inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to provide adequate medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97. "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

For a plaintiff prisoner to prevail in a suit alleging the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "The necessary showing of deliberate indifference can be

manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor,* 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (2017) (quoting *Farmer*, 511 U.S. at 834, 837-38).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *Schilling*, 937 F.3d at 357; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. A "'serious ... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

The Supreme Court explained in *Heyer v. United States Bureau of Prisons*, 649 F.3d 202, 209-10 (4th Cir. 2017): "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson,* 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225.

Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young v. City of Mount Ranier,* 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

Put another way, "it is not enough that the defendant should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*); *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017). "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.' " *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant

injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014); *see De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013).[7]

Of relevance here, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *accord Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). The Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]" *Id.* at 845 (citations and quotation marks omitted). Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard. *Id.*; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not); *Stritehoff v. Green*, CCB-09-3003, 2010 WL 4941990, at *3 (D. Md. Nov. 30, 2010) ("An officer who responds reasonably to 'the risk of which he actually knew' is not liable for deliberate indifference.") (quoting *Brown*, 240 F.3d at 390-91).

Also of import here, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey,* 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical

---

[7] The Supreme Court has rejected the "significant injury" requirement in regard to an excessive force claim under the Eighth Amendment. *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (per curiam); *see Danser*, 772 F.3d at 346 n.8 (distinguishing deliberate indifference claims).

condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."

Similarly, what the Fourth Circuit said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied,* 529 U.S. 1067, (2000), is pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a deliberate indifference claim requires more than a showing of "mere negligence"); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *see Schilling*, 937 F.3d at 357 (recognizing that a defendant's "subjective knowledge can be proven 'through direct evidence of [his] actual knowledge or circumstantial evidence tending to establish such knowledge . . . .'") (quoting *Scinto*, 841 F.3d at 225).

If a risk is obvious, a defendant "cannot hide behind an excuse that he was unaware of a risk." *Brice,* 58 F.3d at 105. But, an inmate's mere disagreement with medical providers as to the

proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones,* 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), aff'd, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.,* DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011).

Here, viewing the evidence in its entirety, in the light most favorable to Sampson, there is no evidence that defendants' alleged conduct amounted to deliberate indifference. Indeed, the record is to the contrary.

Sampson first complained of abdominal and testicular pain, with constipation, and raised the possibility of a hernia, on September 4, 2017. Pinkney performed a physical examination on Sampson, found no evidence of a hernia, assessed him as having epididymitis, and prescribed an antibiotic and an analgesic. Sampson was seen multiple times thereafter by Pinkney, Cyran, and other medical providers, including physicians, nurse practitioners, and registered nurses, in an attempt to address his complaints of pain and constipation.

Cyran examined Sampson on February 17, 2017, and found no signs of a hernia. She ordered labs, a urinalysis, and an x-ray, after noting that Sampson had completed his course of antibiotics, without improvement. On November 28, 2017, Dr. Matera could not induce the hernia, but noted there might be one given Sampson's description, and instructed him to look for symptoms that might require emergency treatment. When Pinkney met with Sampson on January

17, 2018, she confirmed Sampson had an inguinal hernia, but determined that it was reducible, and ordered a hernia belt for him.

Notably, January 17, 2018, was the first time in the record that the hernia was observed by medical providers. Sampson does not allege, nor does the record suggest, that Pinkney or any other defendant was responsible for the subsequent delay in his receipt of the hernia belt. When Cyran saw Sampson on July 23, 2018, she noted his pending consultation request, that the hernia belt was not effective, the hernia was not reducible, and prescribed laxatives and stool softener for his constipation. The decision to continue onsite management of the hernia was made by the utilization team on July 31, 2018. Sampson does not allege, nor does the evidence support, a finding that the defendants named here were involved in making the decision to continue onsite management, *i.e.*, nonsurgical treatment.

When Cyran examined Sampson on January 18, 2019, Cyran noted the hernia was reducible but immediately popped out. Cyran consulted with the medical director regarding resubmitting a consultation for surgery.

In sum, plaintiff was provided medications for his symptoms, examined for signs of a hernia, underwent diagnostic tests, was provided with a hernia belt, and was instructed on symptomology that would need immediate attention. Ultimately, he was provided with hernia repair surgery.

Sampson's mere disagreement with the medical assessments made by defendants, or the pace of the surgical process, does not support an Eighth Amendment claim of constitutionally inadequate medical care. In short, there is no basis to establish a claim that defendants acted with reckless disregard to Sampson's medical needs, so as to satisfy the subjective prong of the

deliberate indifference standard.  And, Sampson does not offer a properly supported declaration or other verified evidence to dispute defendants' Motion.

Sampson also claims that Baker falsified the medical record by recording him as a "no show" to attend a sporting event.  He also questions whether Cyran inferred that he had caused or worsened  his hernia by continuing to exercise, and whether Pinkney failed to record his "injury" and swelling.   Even if true, each defendant's action is insufficient to support a deliberate indifference claim. Generating a document to show the medical appointment had not taken place does not infringe upon a constitutionally protected right.  Further, Sampson continued to receive care for his reported abdominal pain and other medical conditions following the creation of that document.

Sampson's objections to Patterson's alleged demeanor during an investigative interview are also insufficient to support a constitutional claim.  Patterson did not provide medical treatment to Sampson.

At most, plaintiff's allegations may state a claim for medical malpractice (negligence).  To the extent that Sampson predicates his Complaint on allegations of negligence or medical malpractice, such claims cannot proceed here.

Such a claim does not give rise to federal question jurisdiction under 28 U.S.C. § 1331.  Nor is there any indication that diversity jurisdiction exists under 28 U.S.C. § 1332. And, "[w]hen, as here, the federal claim is dismissed early in the case, federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon*

*Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966)).[8]

### IV.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be GRANTED. Judgment will be entered in favor of the defendants and against plaintiff.

A separate Order follows.

February 28, 2020
Date

_____/s/_____
Ellen L. Hollander
United States District Judge

---

[8] The Court expresses no opinion on the merits of a medical malpractice case based on the allegations or evidence here.  Nor may the court give legal advice.  However, plaintiff is cautioned that, in order to bring a medical malpractice claim under Maryland law, there are strict time requirements.  And, a plaintiff must comply with Maryland's Health Care Malpractice Claims Act. *See generally* Md. Code, §§ 3-2A-01 et seq. of the Courts and Judicial Proceedings Article.